Justice KOONTZ, dissenting.
I respectfully dissent. Today, in my view, a majority of this Court permits a capital murder conviction and death sentence to be imposed on Thomas Alexander Porter pursuant to void judgments. I cannot join in that decision. I do not take issue with the majority's conclusion that the evidence adduced at Porter's trial was more than sufficient to establish that Porter committed the murder of Norfolk Police Officer Stanley Reaves. Nor do I take issue with the majority's conclusion that the death sentence in this case, properly obtained, would not be excessive or disproportionate to the penalty imposed in similar cases when reviewed under Code § 17.1-313.
The undisputed procedural facts in this case are no less than a Gordian knot of vague, conflicting, and contradictory orders entered with respect to the change of venue and the subsequent conduct of the trial and the sentencing proceeding. They are remarkable in that they apparently have not occurred in prior cases this Court has been called upon to review. It is unnecessary, however, to repeat in detail all of the procedural facts which are adequately recounted by the majority. The focus here is upon the dispositive procedural facts as they implicate the pertinent statutes within the applicable statutory scheme.
Porter was indicted by a grand jury in the Circuit Court of the City of Norfolk (Norfolk Circuit Court) for the capital murder of Officer Reaves.[1] Porter was subsequently brought to trial on that indictment in the Norfolk Circuit Court in accord with the mandate of Code § 19.2-244 which provides that "[e]xcept as otherwise provided by law, the prosecution of a criminal case shall be had in the county or city in which the offense was committed." On October 2, 2006, the Norfolk Circuit Court entered an order providing "that the trial of [Porter's case] be transferred to the Circuit Court of the Fourth Judicial Circuit located in Arlington, Virginia." This order is vague and conflicting. There is no Fourth Judicial Circuit *450 Court located in Arlington County; the Fourth Judicial Circuit is limited to the City of Norfolk. Code §§ 17.1-500; -506(4). Thus, the majority is left to observe that "[i]t is unclear from the circuit court's order whether it was transferring the place of trial with the Norfolk Circuit Court sitting in Arlington [County] or whether it was intended that the trial be conducted in Arlington [County] as a trial in [the Circuit Court of Arlington County]."
Code § 19.2-251, however, is quite clear. This statute which specifically addresses a change in venue, in pertinent part, provides that: "[a] circuit court may, on motion of the accused or of the Commonwealth, for good cause, order the venue for the trial of a criminal case in such court to be changed to some other circuit court." (Emphasis added). This statute does not purport to permit the Norfolk Circuit Court to transfer itself to Arlington County; it plainly permits the Norfolk Circuit Court in this case to transfer the trial of the case to the Circuit Court of Arlington County (Arlington County Circuit Court).[2] Indeed, that is precisely what occurred in Porter's case as reflected by the subsequent and significant "felony trial orders" which were captioned, as the majority notes, "In the Circuit Court of the County of Arlington." Clearly, Porter was tried and convicted in the Arlington County Circuit Court. A March 7, 2007 order entered by the Arlington County Circuit Court reflects the Arlington County jury's guilty verdict on the charge of capital murder, and a March 14, 2007 order entered by that court reflects the jury's sentence of death.
The March 14, 2007 order entered by the Arlington County Circuit Court also granted Porter's motion "to refer this matter to the Probation Office for the Circuit Court of Norfolk, Virginia" and continued the case to July 16, 2007 "in the Circuit Court of the City of Norfolk." Thereafter, by order entered on July 18, 2007 in the Norfolk Circuit Court, Porter was sentenced to death in accord with the Arlington County jury verdict.
Finally, it is undisputed that Judge Charles D. Griffith, Jr., a judge of the Norfolk Circuit Court, presided over all the proceedings conducted in the Norfolk Circuit Court as well as those in the Arlington County Circuit Court. Judge Griffith, however, was never designated, pursuant to Code § 17.1-105, to preside over Porter's trial in the Arlington County Circuit Court.
Considering these undisputed procedural facts, it becomes readily apparent that Porter was tried and convicted of capital murder in one circuit court and sentenced to death in another, separate circuit court. The resolution of the issue of the "subject matter jurisdiction" of these courts perhaps is not so readily apparent and explains the considerable efforts exerted by the majority to resolve that issue.
The foundation upon which the majority builds its analysis is its interpretation and application of Code § 17.1-513. This statute generally provides the civil and criminal jurisdiction of circuit courts and, in pertinent part, provides that "[t]hey shall also have original jurisdiction of all indictments for felonies and of presentments, informations and indictments for misdemeanors." (Emphasis added). The majority interprets this provision to mean that in Porter's case "both the Norfolk Circuit Court and the Arlington Circuit Court had subject matter jurisdiction for the trial of the charges against Porter." Without this foundation, the balance of the majority's analysis simply unravels.
Code § 17.1-513 is the statute that indeed establishes the potential subject matter jurisdiction of all the circuit courts in this Commonwealth. This statute grants the authority to adjudicate certain classes of cases, including indictments for felonies. See Morrison v. Bestler, 239 Va. 166, 169, 387 S.E.2d 753, 755 (1990). Code § 17.1-513, however, does not resolve the issue whether a particular circuit court has subject matter jurisdiction over a particular criminal felony case. Surely, it would not be seriously contended *451 that because all circuit courts are authorized by Code § 17.1-513 to try all indictments for felonies that an accused can be indicted for a felony committed in one jurisdiction in the Commonwealth and yet tried in another in the absence of additional statutory authority permitting that to occur. In this context, it should be evident that Code § 17.1-513 addresses only the potential jurisdiction of all circuit courts to try felony cases.
The statutory scheme implicated by the procedural facts in this case further undermines the foundation of the majority's analysis. Code § 19.2-244, in pertinent part, provides that "[e]xcept as otherwise provided by law, the prosecution of a criminal case shall be had in the county or city in which the offense was committed." Thus, in Porter's case the prosecution of the criminal charge against him was mandated to occur initially in the City of Norfolk. And, only the Norfolk Circuit Court initially had jurisdiction to try that case pursuant to Code § 19.2-239 which provides that circuit courts "shall have exclusive original jurisdiction for the trial of all presentments, indictments and informations for offenses committed within their respective circuits." (Emphasis added).
Porter requested a change of venue in this case, and the Norfolk Circuit Court granted that request as it was authorized to do pursuant to Code § 19.2-251. However, as noted above, this statute expressly authorized the Norfolk Circuit Court to transfer venue "to some other circuit court." Code § 19.2-253 then provides that "[t]he clerk of the court which orders a change of venue shall certify copies . . . of the record of the case to the clerk of the court to which the case is removed, . . . and such court shall proceed with the case as if the prosecution had been originally therein." This statutory scheme makes clear that upon a change of venue the jurisdiction of the circuit court to which the case is transferred is statutorily invoked and that court then has the "exclusive original jurisdiction" to try criminal offenses "as if the prosecution had been originally therein." Thus, the Arlington County Circuit Court had subject matter jurisdiction to try Porter's case; the Norfolk Circuit Court no longer had such jurisdiction. In short, Code § 17.1-513 simply provides no basis to conclude, as the majority does in this case, that both circuit courts had subject matter jurisdiction for the trial of the felony charges against Porter.
While the Arlington County Circuit Court exercised its jurisdiction to conduct the guilt determination phase of Porter's capital murder trial, it is undisputed that Porter was sentenced to death by the Norfolk Circuit Court. There is no statutory provision which permits one circuit court to try a capital murder case and for another circuit court to impose the sentence of death recommended by the trial jury in the initial court. Code § 19.2-264.4 contemplates that only one circuit court conduct the trial and sentencing proceedings. Moreover, even under the majority's interpretation of Code § 17.1-513 that all circuit courts have jurisdiction to try a capital murder case, Code § 19.2-251 does not purport to authorize the circuit court that conducts the guilt phase of a capital murder trial to transfer the sentencing phase of the trial to another circuit court. Therefore, in Porter's case the sentence of death imposed by the Norfolk Circuit Court was void and would require that judgment to be reversed and further require a remand to the Arlington County Circuit Court for a new sentencing hearing. See Code § 19.2-264.3(C).
But then there remains the issue of the authority of Judge Griffith in this case to preside over the trial itself in the Arlington County Circuit Court. While the majority is ambivalent over whether a designation pursuant to Code § 17.1-105 was required in this case, it concludes that "a missing order of designation would only have affected the circuit court judge's authority to act in the exercise of territorial jurisdiction." Thus, the majority disposes of the issue by concluding that it is waived because Porter did not raise the issue at his trial.
To reach this conclusion the majority goes to some length to ultimately overrule our prior decision in Gresham v. Ewell, 85 Va. (10 Hans.) 1, 85 Va. 1, 6 S.E. 700 (1888), where this Court held that a judgment was "null and void" because a judge from another jurisdiction rendered a judgment without proper designation to conduct court in the *452 jurisdiction where trial occurred. 85 Va. at 2, 6 S.E. at 701. Until today, Ewell has been the law of this Commonwealth and I am unpersuaded by the majority's analysis which appears to be premised on little more than a change of opinion by the present majority since Ewell was decided.
In my view, that analysis is not persuasive. In Porter's case, the judge who presided over his trial in the Arlington County Circuit Court had no authority to do so. It is not simply a matter, however, that the judge had no authority to try a case in a jurisdiction other than the jurisdiction for which he was commissioned to serve as a circuit judge. In this case, because Judge Griffith was not designated as a judge of the Arlington County Circuit Court, Porter was tried in a court without an authorized presiding judge; indeed, he was tried in a court presided over by a person who was in essence a stranger to that court. As a result, and consistent with the rationale of Ewell, the Arlington County Circuit Court, the trial court, was not authorized to exercise subject matter jurisdiction over the guilt phase of Porter's case and the court's conviction order was therefore void and not merely voidable. Executing a defendant in reliance upon a void order of conviction is, in my view, the ultimate denial of due process. Accordingly, I would not merely reverse Porter's sentence of death but I would reverse Porter's convictions and remand the case for a new trial if the Commonwealth be so advised.
Obviously, I need go no further in my analysis of Porter's case. Nevertheless, I also dissent from the majority's determination that Porter was not entitled to have the trial court appoint Dr. Cunningham as an expert to assist Porter in establishing that he would not present a serious threat to society if he were to be sentenced to life in prison without possibility of parole. The majority concludes that Porter did not establish a "particularized need" to have an expert assist him in presenting evidence to respond to the Commonwealth's contention that Porter was subject to the death penalty because he remained a continuing danger to society.
Under Virginia's statutory scheme, capital murder as defined in Code § 18.2-31 constitutes a Class 1 felony punishable under Code § 18.2-10, as pertinent here, only by either a sentence of death or life imprisonment. A defendant who commits a capital murder after January 1, 1995 and is sentenced to imprisonment for life is not eligible for parole, and the jury is so instructed. Code § 19.2-264.4(A); Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999). A defendant convicted of capital murder in Virginia becomes eligible for the death penalty only if the Commonwealth proves beyond a reasonable doubt that
there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.
Code § 19.2-264.4(C)
Significantly, under this statutory scheme a finding of one or both of these aggravating factors does not mandate the imposition of the death penalty. Rather, the jury is only "limited to a determination as to whether the defendant shall be sentenced to death or life imprisonment." Code § 19.2-264.4(A). "In the event the jury cannot agree as to a penalty, the court shall . . . impose a sentence of imprisonment for life." Code § 19.2-264.4(E).
Once a defendant has been convicted of capital murder, the obviously critical issue to be determined is whether that defendant shall be sentenced to death or life imprisonment without possibility of parole. Under Virginia's statutory scheme, the initial focus of that determination falls upon whether the Commonwealth proves beyond a reasonable doubt either of the aggravating factors that makes the defendant eligible for the death sentence. On such a critical issue, there can be no question but that the defendant has a fundamental right to introduce appropriate evidence to rebut the Commonwealth's evidence regarding these aggravating factors.
*453 See, e.g., Gardner v. Florida, 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (holding that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of "information which he had no opportunity to deny or explain"); see also, Skipper v. South Carolina, 476 U.S. 1, 8, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)(death sentence overturned where defendant was denied right to introduce evidence regarding his good behavior in jail). Pertinent to Porter's case, the Supreme Court in Skipper noted that "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule . . . that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement." Id. at 5 n. 1, 106 S.Ct. 1669.
In this case, the jury did not find the vileness aggravating factor had been proven by the Commonwealth's evidence and, thus, the jury's decision to impose the death sentence rested solely on its determination that Porter presented a further danger to society sufficient to warrant that penalty. Accordingly, if Porter was denied due process by the trial court's refusal to appoint an expert who would have offered testimony to rebut the Commonwealth's assertions of future dangerousness, then unquestionably the sentence of death must be vacated. The Commonwealth does not contend that Porter was financially able to independently employ such an expert.
Recently, in Juniper v. Commonwealth, 271 Va. 362, 626 S.E.2d 383, cert. denied, ___ U.S. ___, 127 S.Ct. 397, 166 L.Ed.2d 282 (2006), this Court held that the jury's "determination of future dangerousness revolves around an individual defendant and a specific crime." Id. at 425, 626 S.E.2d at 423. The Court explained that in admitting expert testimony as pertinent in rebuttal of the Commonwealth's attempt to prove future dangerousness, "such evidence should `concern the history or experience of the defendant.'" Id. at 425-26, 626 S.E.2d at 423. (quoting Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, cert. denied, 528 U.S. 873, 120 S.Ct. 177, 145 L.Ed.2d 149 (1999)). The Court has further explained that only "evidence peculiar to a defendant's character, history and background is relevant to the future dangerousness inquiry." Bell, 264 Va. at 201, 563 S.E.2d at 714. In accordance with this reasoning, the Court has previously rejected expert testimony regarding generalized "daily inmate routine [and] general prison conditions." Burns v. Commonwealth, 261 Va. 307, 338, 541 S.E.2d 872, 892, cert. denied, 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 542 (2001).
Applying these principles, the Court has upheld a trial court's decision to deny the appointment of a risk assessment expert where the testimony proffered was not sufficiently specific and particularized to the defendant to rebut the Commonwealth's assertions that the defendant would pose a future danger to society. Accordingly, in Juniper, this Court upheld a trial court's rejection of expert testimony where
[n]either the actual proffer, counsel's argument, nor [the expert's] explanations . . . was "specific to [the defendant]". . . . [The expert] offered nothing to the trial court to support his opinion as being based on [the defendant's] individual characteristics that would affect his future adaptability in prison and thus relate to a defendant-specific assessment of future dangerousness.
Id. at 427, 626 S.E.2d at 424 (internal citations omitted). Similarly, in Burns, 261 Va. at 340, 541 S.E.2d at 893, the Court rejected the appointment of a risk assessment expert to rebut the Commonwealth's future dangerousness assertions where the expert's testimony failed to "focus . . . on the particular facts of [the defendant's] history and background, and the circumstances of his offense."
In my view, Dr. Cunningham's proffered testimony regarding the question of Porter's future dangerousness is sufficiently specific and particularized with respect to Porter's individual characteristics, history and background, and past offenses. In the affidavit proffered by Porter in support of his motion for Dr. Cunningham's appointment, Dr. Cunningham explained that his "individualized assessment" evaluated a number of factors in determining whether a particular defendant *454 posed a future danger to society. The affidavit detailed the typical scientific basis and methodology used by the doctor in assessing a particular defendant, including "his age, his level of educational attainment . . . other features and characteristics regarding him [and] particularized to him based on demographic features, adjustment to prior incarceration, offense and sentence characteristics, and other factors." It also included information regarding how, if appointed, Dr. Cunningham would determine the setting and time span in which Porter's violent conduct would be likely to occur, the base rate of serious violence in that particular setting, and the individual characteristics and prior record of Porter in relation to the likelihood of serious violence in the prison setting.
Thus, I am persuaded that Dr. Cunningham's proffered testimony was relevant to the issue of Porter's future dangerousness because it was sufficiently "specific" to Porter based on Porter's individual characteristics, and focused "on the particular facts of [Porter's] history and background, and the circumstances of his offense." Juniper, 271 Va. at 426, 626 S.E.2d at 423; see also Burns, 261 Va. at 340, 541 S.E.2d at 893. Accordingly, even if I could agree with the majority that the failure to establish proper jurisdiction in this case was merely a failure of "territorial" jurisdiction and the objection thereto was waived by Porter's failure to raise the issue, I would nonetheless hold that Porter was denied due process because he was denied the opportunity to present competent, relevant expert testimony to rebut the Commonwealth's assertion that he posed a continuing danger to society. And on this ground, I would vacate the sentence of death imposed on Porter and remand the case for a new sentencing proceeding in which Porter would have the benefit of Dr. Cunningham's testimony.[3]
Finally, I am compelled to warn that the various issues raised in this case may tend to exemplify certain aspects of the conduct of capital murder trials in this Commonwealth that slowly, but inexorably, will erode public confidence that the death penalty is being imposed in a fair and consistent manner. Surely, the citizens of Virginia expect, and have the right to expect, that the courts of the Commonwealth will conduct death penalty trials with due regard for the constitutional and statutory safeguards that are meant to ensure that the maximum penalty will be imposed only in those instances where it is truly necessary to advance the cause of justice and secure the lives and welfare of the people. Moreover, it should be expected, and justice demands, that even in cases where a sentence of death may be appropriate, its imposition will occur through a strict and faithful adherence to due process of law. If the courts empowered to sit in judgment over those accused of typically heinous crimes fail to take the greatest care in assuring the fairness of the proceedings that result in the imposition of the death penalty, then it must inevitably follow in time that the death penalty statutes of this Commonwealth will no longer pass constitutional muster. For now, however, I take some comfort in the conclusion that the manner in which Porter's case was conducted is atypical of the manner in which our trial courts conduct capital murder trials.
---------------
2. Code § 17.1-114 permits the circuit court under circumstances not applicable here to hold its sessions at locations other than at its designated courthouse within the geographical limits of its circuit. This statute, when applicable, further provides that "[e]xcept as provided in this section or as agreed by all parties to an action, no session of a circuit court shall be held outside the geographical limits of the county or city of which it is the court."
3. I have not addressed the courtroom security issue raised by Porter, though I am troubled by the possibility that excessive security measures may have created prejudice against Porter in the sentencing phase of his trial. Accordingly, I do not join in the majority's decision to affirm on that issue.
---------------